THIS DISPOSITION IS CITABLE
AS PRECEDENT OF THE TTAB

Hearing:                          Mailed:  December 28, 2006
October 5, 2006                                         PTH


**UNITED STATES PATENT AND TRADEMARK OFFICE**

————————

**Trademark Trial and Appeal Board**

————————

In re The Black & Decker Corporation

————————

Serial No. 76570453

————————

William G. Pecau of Steptoe & Johnson LLP for The
Black & Decker Corporation.

Linda Estrada, Trademark Examining Attorney, Law Office 104
(Chris Doninger, Managing Attorney).

————————

Before Hairston, Drost and Kuhlke, Administrative Trademark
Judges.

Opinion by Hairston, Administrative Trademark Judge:

    The Black & Decker Corporation seeks registration on

the Principal Register pursuant to Trademark Act Section

2(f) of the mark depicted below for "metal door hardware,

namely, knobs, levers, leversets, handles and handle sets sold with deadbolt keys, and key blanks sold to supplement or to replace deadbolt keys for knobs, levers, handles and handle sets."[1]



The following description of the mark is of record: "The mark consists of the design of a key head." The following lining statement is also of record: "The dotted outline of the key is not part of the mark, but is merely intended to show the position of the mark."

Registration has been finally refused on the ground that the proposed mark comprises a configuration of the goods which is not inherently distinctive, and thus would not be perceived as a mark, because the trademark examining attorney has found applicant's attempted showing of

---

[1] Application Serial No. 76570453, filed January 16, 2004, claiming a date of first use and first use in commerce of July 23, 1982. The application was assigned from Baldwin Hardware Corporation, the original applicant at the time of filing, to The Black & Decker Corporation. The assignment was recorded with the USPTO Assignment Division at Reel 2982, Frame 0453.

acquired distinctiveness to be insufficient.[2] The refusal has been appealed and both applicant and the examining attorney have filed briefs. An oral hearing was held at which counsel for applicant and the examining attorney were present.

The sole issue on appeal is whether the applied-for mark has acquired distinctiveness. Applicant carries the burden of proving a *prima facie* case of acquired distinctiveness. Yamaha Int'l. Corporation v. Hoshino Gakki Co., 840 F.2d 1572, 6 USPQ2d 1001 (Fed. Cir. 1988). There is no set amount of proof necessary to demonstrate acquired distinctiveness.

In support of its acquired distinctiveness claim, applicant relies on the declaration of its vice president for marketing, Bernie Kropfelder, who states that applicant has been using the applied-for mark in the United States since 1982. Further, according to Mr. Kropfelder, "[t]he Baldwin Key Head Design mark has been extensively advertised and promoted through retail stores, promotional materials distributed to the trade and media, advertising in the media and trade publications, and on Baldwin Hardware's web site;" and that from 2000 to 2004, applicant

---

[2] We note that the present examining attorney was not the original examining attorney for this application.

spent more than $20 million on advertising and marketing products identified by the Baldwin Key Head Design mark, and during the same period earned over $500 million in sales revenues. (Kropfelder declaration ¶¶ 5-6).

In addition, applicant submitted the declaration of its marketing manager, Judith Drey, who attests that she has been involved in marketing Baldwin hardware for over thirteen years. According to Ms. Drey, Baldwin metal door locksets are "prestigious products" and "some retail for as much as $800"; that "the high quality of Baldwin locksets and other door hardware is well recognized by the trade and consumers"; that "[t]he octagonal Baldwin Key Head Design is an arbitrary design that is a source identifier for Baldwin door hardware"; that "it is an industry practice to use different and identifiable key head designs for locksets and keys"; that "other high end door lockset manufacturers use distinctly different configurations for their key heads"; that "Baldwin promotions have featured the Baldwin Key Head Design prominently as a source identifier for Baldwin door hardware"; that "Baldwin has distributed for more than 4 years large quantities of Baldwin Key Design [lapel][3] pins that are used by

---

[3] While the declaration recites the word "label," it is clear that the intended word is "lapel."

4

salespersons at the point-of-sale"; and that since 2001 Baldwin has used "an octagonal Baldwin Logo for all its advertising and promotional materials that reflect the octagonal shape of its Key Head Design mark." (Drey declaration ¶¶ 1-8). Accompanying the Kropfelder and Drey declarations are examples of applicant's advertising and promotional materials. We note, in particular, a contest entry card that features a prominent photograph of a Baldwin key in the upper left-hand corner and a product sheet that features a prominent photograph of a Baldwin key along with the wording "A premium brand in door hardware, Baldwin says quality .. the Baldwin key says prestige." Also accompanying the declarations are photographs of the key heads of other manufacturers of door locksets.

Applicant also submitted ten customer declarations; eight from retailers who sell applicant's goods, and two from consumers who have purchased applicant's goods. The eight form letters from the retailers read, in pertinent part, as follows:

> 1. I am the _____ of _____, a retailer of hardware and home improvement industry [products] for_____ years. I make the following statements on my personal knowledge.
>
> 2. Based on my experience in the industry, I am very familiar with door hardware and locksets. Baldwin Hardware Corporation sells a full line of door hardware, including keys and key blanks.

3.  One of the most popular lines of door hardware sold by my company is the Baldwin Hardware line of lock products.  This line is identified by a unique and distinctive key head design that has a specific octagonal shape.  I am not aware of any other key design that uses a similar octagonal shape design.

4.  The octagonal shape design key head design is unique and creates a recognizable and distinctive appearance for Baldwin Hardware Keys.  Further, Baldwin Hardware has engaged in considerable efforts to advertise and promote this key head design as identifying its products to consumers and members of the trade.  In my opinion, consumers have come to recognize this key head design as identifying Baldwin Hardware products and distinguishing them from other competitor's products.  Baldwin Hardware has a reputation for high end quality in the industry.

The two form letters from consumers read, in pertinent part, as follows:

2.  I purchase hardware and home improvement products.  I am familiar with the distinctive octagonal shape of Baldwin Hardware Keys.  I own Baldwin Hardware Keys having the octagonal shape on its key head that I use with my Baldwin door locks.

3.  When I see the octagonal shape key head design, I associate it only with Baldwin Hardware door hardware and no other manufacturer of keys, locks or door hardware.

Finally, applicant submitted five third-party registrations for marks consisting of other key head designs for door hardware such as keys, locks, key blanks, knobs, levers and leversets.

Applicant asserts that the foregoing evidence clearly shows that its particular key head design has come to be perceived as a source indicator for its goods.

The examining attorney, however, argues that the evidence is insufficient. The examining attorney maintains that applicant's advertising and promotional materials do not evidence that applicant's key head design is promoted as a trademark, that is, there is no "look for" advertising and promotion. The examining attorney acknowledges that applicant's sales and advertising figures are high, but argues that in the absence of this type of advertising and promotion, the high advertising and sales figures show only the commercial success of applicant's goods, not that the key head design has acquired distinctiveness as an indication of the source of the goods. Insofar as the customer affidavits are concerned, the examining attorney maintains that the eight form letters from retailers are not persuasive because the retailers are biased since they have all dealt with applicant, and the customer affidavits are few in number. While the examining attorney maintains that applicant's evidence is insufficient to establish acquired distinctiveness, the examining attorney did not submit any evidence that undercuts applicant's position.

That is, there is no evidence of use of very similar key head designs by others.

After careful consideration of the arguments and evidence of record, we find that applicant's showing is sufficient to establish a *prima facie* case of acquired distinctiveness and the examining attorney has not rebutted that showing. The record reflects that applicant has used the mark which it seeks to register continuously for twenty-four years. Applicant's key head design is prominently displayed in several of its advertising and promotional materials and on lapel pins worn by salespersons. Further, as the examining attorney acknowledges, applicant's sales and advertising figures are substantial. Indeed, for the period 2000-2004, applicant's total sales have exceeded a half a billion dollars and its advertising expenditures have exceeded $20 million.

After reviewing applicant's evidence of record, we recognize that there is no "look for" advertising or promotion of the octagonal key head design. In certain cases, the Board has been critical of an applicant's claim of acquired distinctiveness when the product design sought to be registered merely appears in advertising materials and there is no evidence of the promotion of the product design in such materials. See e.g., In re Edward Ski

8

Products, Inc., 49 USPQ2d 201 (TTAB 1999) [no evidence that the configuration of a ski mask promoted as an indication of origin]; and In re Pingel Enterprises Inc., 46 USPQ2d 1811 (TTAB 1988) [no advertising or promotion of trademark significance of the product configuration]. In this case, however, the absence of "look for" advertising or promotion does not mean that consumers do not recognize the design as applicant's trademark. Here, applicant's marketing manager, Ms. Drey, has stated that it is an industry practice for manufacturers of door locksets to use different and identifiable key head designs for their locksets and keys. We note that this Board has previously considered industry practices in acknowledging that colors operate as source indicators for wire rope. See e.g., Amsted Industries Inc. v. West Coast Rope & Rigging Inc., 2 USPQ2d 1755, 1757 (TTAB 1987) ["A rather unusual aspect of how color is generally applied to one or more strands of wire rope as an industry practice was the subject of considerable testimony and evidence. Even though the third-party registrations attached to applicant's brief are not in evidence, supra, note 4, there is no doubt, on opposer's record, that a number of suppliers of wire rope utilize one or more distinctively colored wire rope strands to serve as indicators of origin and have registered these

indicia as trademarks") and Wire Rope Corporation of America, Inc. v. Secalt S.A., 196 USPQ 312, 315 (TTAB 1977) ["Insofar as the nature of the use of colored strands in the wire products field is concerned, it is not disputed that it is the custom, as previously indicated, for manufacturers to use different colors for application to their wire rope or cable for identification purposes and that purchasers do recognize the individual colors as source indicia"). Here, applicant has submitted photographs of ten key heads from other manufacturers of door locksets that are different from applicant's key head design and five third-party registrations for marks consisting of key head designs for door hardware. In other words, the evidence in this case shows that it is common for manufacturers of door hardware to use key head designs as source indicators. This makes it all the more likely that consumers would perceive applicant's applied-for mark as a trademark. Cf. In re Upper Deck Co., 59 USPQ2d 1688, 1693 (TTAB 2001) ["[T]he common use of holograms for non-trademark purposes means that consumers would be less likely to perceive applicant's use of holograms as trademarks"]. The record also shows that applicant's octagonal key head design is unlike the key head designs used by other manufacturers of door locksets. Compare In

re Gibson Guitar Corp., 61 USPQ2d 1948 (TTAB 2001) [Applicant failed to meet its high evidentiary burden where its guitar configuration was extremely similar to those used by other guitar manufacturers]. In short, the absence of "look for" advertising or promotion of applicant's key head design is not a critical factor in this case.

Further, in this case, there is competent evidence of consumer recognition of the octagonal key head design as a trademark. The language in both the retailer and the ultimate consumer declarations is clear as to what is understood to represent applicant's applied-for mark. We disagree with the examining attorney's assessment that the eight retailer declarations are biased and therefore entitled to little weight. There is simply no evidence to suggest that these retailers were predisposed to say that applicant's goods are identified by the octagonal key head design. Finally, while the two declarations from the ultimate consumers of applicant's goods are not an overwhelming number, we must consider applicant's evidence in its entirety.

Based on this record in its totality, and for the reasons discussed above with particular consideration given to the industry practice, we find that applicant has established a *prima facie* case that the applied-for mark

has become recognized as indicating applicant and the metal door hardware it sells.

    **Decision**:  The refusal to register is reversed.